**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                                            :
                                                            :
RAYMOND BONNER and ALEX GIBNEY,              :        Case No. 18-cv-11256
                                                            :
                          Plaintiffs,                       :
                                                            :
                    -against-                               :
                                                            :        **COMPLAINT**
CENTRAL INTELLIGENCE AGENCY,                  :
                                                            :
                          Defendant.                        :
                                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## INTRODUCTION

1.       This complaint for declaratory relief arises out of actions taken by defendant

Central Intelligence Agency ("CIA") that have effectively gagged the speech of former Federal

Bureau of Investigation ("FBI") Special Agent Ali Soufan in violation of the First Amendment to

the United States Constitution.  The gag imposed upon Mr. Soufan is part of a well-documented

effort by the CIA to mislead the American public about the supposedly valuable effects of

torture, an effort that has included deceptive and untruthful statements made by the CIA to

Executive and Legislative Branch leaders. On information and belief, the CIA has silenced

Mr. Soufan because his speech would further refute the CIA's false public narrative about the

efficacy of torture.

2.       In 2011, Mr. Soufan published a personal account of his service as a top FBI

interrogator in search of information about al-Qaeda before and after the 9/11 terrorist attacks.

Soufan's original manuscript discussed, among other things, his role in the FBI's interrogation of

a high-value detainee named Zayn Al-Abidin Muhammed Husayn, more commonly known as

Abu Zubaydah.  Soufan was the FBI's lead interrogator of Zubaydah while he was being held at

a secret CIA black site.  His manuscript described the process by which FBI interrogators were able to win Zubaydah's confidence and elicit actionable intelligence without the use of torture, or the so-called "enhanced interrogation techniques" (EITs), and the intense disputes that arose about the efficacy of the EITs used by CIA contractors during Zubaydah's interrogation.

3.      In writing his manuscript, Mr. Soufan took care not to disclose any confidential sources or methods used by either FBI or CIA interrogators or to include any other classified information.  During pre-publication review of the manuscript, required as a condition of Soufan's FBI employment, the FBI raised no significant objections to the manuscript or to the disclosure of the information Soufan included about the Zubaydah interrogations.  It approved publication of the manuscript largely as submitted.

4.      The CIA disagreed.  It asserted that large swaths of the manuscript were classified and could not be disclosed, including descriptions of the FBI's interrogations of Zubaydah whose disclosure the FBI itself had already approved.  Applying capricious, malleable and opaque standards, the CIA instructed Mr. Soufan to remove from the manuscript true, newsworthy information about the interrogation and treatment Zubaydah that it considered classified.  As a result, Soufan's book, *The Black Banners: The Inside Story of 9/11 and the War Against Al-Qaeda,* was published with many sentences, paragraphs and entire pages blacked out, pursuant to CIA dictates.

5.      Plaintiff Raymond Bonner is an experienced investigative journalist and plaintiff Alex Gibney is a highly-regarded documentarian.  Between them, plaintiffs have over 65 years of journalistic experience and many professional accolades, including a Pulitzer Prize and an Academy Award.  They are currently working together on a documentary about the CIA's use of so-called EITs after 9/11, and the effectiveness of those techniques (the "Documentary").  Their

project focuses in particular on the widely-reported use of EITs on Abu Zubaydah and will explore the intense dispute that developed between the FBI and CIA over the use and value of those techniques.

6.     As described in congressional hearings, declassified government reports, court records, and other investigative proceedings, while Zubaydah was being secretly held by the CIA he was waterboarded at least 83 times and became the prime subject for the experimental use of other techniques subsequently termed EITs—both authorized and unauthorized.  His treatment and the results produced by the CIA's interrogation techniques remain a subject of great controversy.  Just recently, during public debate over the confirmation of Gina Haspel as Director of the Central Intelligence Agency, the CIA presented a drastically different picture about the value of EITs than has been painted by other officials, including former FBI Special Agent Soufan.

7.     Plaintiff Gibney has interviewed Mr. Soufan for the Documentary in an effort to record his first-hand account of the treatment of Zubaydah and the information obtained from him by FBI and CIA interrogators.  But Soufan refused to discuss any information that the CIA removed from his book as purportedly classified—including information about Zubaydah.

8.     Mr. Soufan has stated his firm belief that the material about Zubaydah censored from his book by the CIA was never properly classified, and that it cannot in any event be considered properly classified today in light of multiple, subsequent disclosures by the CIA and other government officials since his book was published.  Nevertheless, given the CIA's insistence that the redacted information is classified, Soufan will not answer any questions posed by plaintiffs that would reveal information the CIA required to be removed from *The Black Banners*.

9.      But for the restrictions the CIA has placed upon him, Mr. Soufan would willingly share this information with plaintiffs, who have a well-established First Amendment right to receive this information from a willing speaker.  *See In re in re Dow Jones & Co.*, 842 F.2d 603, 607 (2d Cir. 1988).  Plaintiffs therefore seek a declaratory judgment that the restrictions imposed upon Soufan's speech by the CIA constitute an unconstitutional prior restraint that is depriving plaintiffs of truthful information from a willing speaker on a matter of public concern, in violation of their rights under the First Amendment.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

11.     The United States District Court for the Southern District of New York is a proper venue for this action pursuant to 28 U.S.C. § 1391(e), because defendant CIA is an agency of the United States, no real property is involved in this action, and plaintiff Bonner resides in this District.  Defendant's actions have also caused injury to plaintiffs in this District, where they are engaged in preparing the Documentary.

12.     This Court is authorized to provide declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, and the All Writs Act, 28 U.S.C. § 1651.

## PARTIES

13.     Plaintiff Raymond Bonner is a Pulitzer Prize-winning investigative journalist and author with over 35 years of professional experience at major publications including the *New York Times*, *New Yorker*, *Atlantic*, *New York Review of Books*, and *New York Times Book Review*.  He is currently a contributing writer for *ProPublica*, an independent, non-profit, online newsroom based in New York.  Bonner has written extensively about international security, the U.S. War on Terror, the treatment of terrorist suspects in the aftermath of 9/11, and detention practices at Guantanamo Bay, Cuba.  He is a resident of the City and State of New York.

4

14. Plaintiff Alex Gibney is an award-winning documentary filmmaker with over 30 years of professional experience and over 40 films to his credit, including *Taxi to the Dark Side*, an Academy Award-winning feature-length documentary about the U.S. policy on interrogation and torture in the aftermath of 9/11. He is a resident of the State of New Jersey. His principal place of business is in the State of New York.

15. The Central Intelligence Agency ("CIA") is an Executive Branch agency located in the State of Virginia.

16. Non-party Ali Soufan is a former FBI Special Agent, and current Chairman and CEO of the Soufan Group, a consulting firm providing strategic security intelligence services to governments and multinational organizations. He is a resident of the State of New Jersey. His principal place of business is in the State of New York.

## FACTUAL BACKGROUND

### Abu Zubaydah

17. On or about March 28, 2002, Zayn al-Abidin Muhammad Husayn, a/k/a Abu Zubaydah, a suspected member of al-Qaeda, was taken into custody by U.S. forces in Faisalabad, Pakistan.

18. On or about March 31, 2002, Zubaydah was transferred to a secret CIA-administered detention facility in Thailand. There, in August 2002, he was subjected to 83 sessions of waterboarding by the CIA. According to Zubaydah's attorney, he is the only United States detainee whom the U.S. government subjected to all of the publicly disclosed EITs designed by the CIA.

19. In September 2006, Zubaydah was transferred to the United States naval base at Guantánamo Bay, Cuba, where he remains in military detention to this day. He has never been charged with any crime.

20.     The treatment of Zubaydah while in U.S. custody, and particularly the CIA's use of EITs during his interrogation at the black site, has been the focus of multiple investigative proceedings, including open Congressional hearings and published reports by, among others, the CIA Inspector General's Office, the Senate Select Committee on Intelligence, and the European Court of Human Rights.  The treatment of Abu Zubaydah while in U.S. custody has also been the subject of innumerable articles in the press.

21.     Several books published by ex-CIA employees have described the interrogation of Abu Zubaydah and the CIA's use of EITs on him.  These books include:

- *Hard Measures: How Aggressive CIA Actions After 9/11 Saved American Lives* by Jose Rodriguez, former head of the CIA's Counterterrorism Center.

- *Enhanced Interrogation: Inside the Minds and Motives of the Islamic Terrorists Trying To Destroy America* by James Mitchell, who played a key role in devising the EIT program for the CIA.

- *At the Center of the Storm: My Years at the CIA* by George Tenet, former CIA Director.

22.     On information and belief, each of these books was subject to review and approval by the CIA prior to publication.  As published, none of these books contain any redactions to their descriptions of Zubaydah's interrogation by the CIA.

**Ali Soufan and *The Black Banners***

23.     Ali Soufan is a former FBI Special Agent who joined the Bureau in 1997 and was assigned to its New York Field Office.  On information and belief, at the time he was hired by the FBI, Mr. Soufan signed an employment agreement that provided in relevant part:

Prior to making any disclosure [of information gained as a result of FBI employment], I will seek a determination of whether the information may be disclosed. I agree to be bound by the guidelines governing prepublication review found in the FBI's Prepublication Review Policy Guide (0792PG) as those procedures may from time to time be amended. I understand that, in this context, "publication" includes disclosure of information to anyone by any means.  I will submit for review the full text of any proposed disclosure addressed by the FBI's

Prepublication Review Policy or this employment agreement as required by the policy at least thirty (30) working days prior to the proposed publication.

24.     On information and belief, when he was hired by the FBI Mr. Soufan also signed Standard Form 312, pursuant to which he agreed not to disclose U.S. Government classified information without prior approval, and acknowledged his understanding that any unapproved disclosure of classified information might result in criminal penalties.

25.     Within two years of joining the FBI, Mr. Soufan was named the FBI's lead investigator regarding the bombing of the USS Cole by al-Qaeda in October 2000.

26.     At the time of the September 11, 2001 attacks, Mr. Soufan was the only Arabic-speaking FBI agent headquartered in New York City.

27.     As a result of his preexisting knowledge of al-Qaeda and his fluency in Arabic, following 9/11 Mr. Soufan immediately became a central figure in the intensive, multi-agency investigation of the attacks.  As a part of that investigation, in the spring of 2002, Mr. Soufan carried out the initial interrogations of Abu Zubaydah at the CIA black site, using routine, non-classified FBI interrogation techniques.

28.     Mr. Soufan's interrogations resulted in actionable intelligence used by the U.S. Government to foil additional potential terrorist attacks and to uncover critical information about the organization and leadership of al-Qaeda.

29.     Despite his successes, the CIA soon removed Mr. Soufan from his role as Zubaydah's primary interrogator.  For a time thereafter, Mr. Soufan remained at the black site and observed the CIA's interrogation of Zubaydah, including the CIA's experimentation on Zubaydah with what would later be termed enhanced interrogation techniques.  Among other things, Mr. Soufan observed Zubaydah subjected to forced nudity, extreme noise pollution, freezing temperatures, and sleep deprivation, and he observed a "containment box."

30.     When Mr. Soufan reported to his FBI superiors the details of the CIA's use of EITs on Zubaydah, Mr. Soufan was ordered to leave the black site and discontinue any participation in Zubaydah's interrogation.

31.     Mr. Soufan remained with the FBI as a Special Agent until he resigned for unrelated reasons in 2005.

32.     In 2009, Mr. Soufan was called to testify before the Senate Judiciary Committee during its investigation of the CIA's use of EITs.  In his public testimony, Mr. Soufan discussed his experiences in interrogating Zubaydah as well as his observation of the treatment of Zubaydah at the black site.  Mr. Soufan provided the Committee his opinion that the CIA's use of EITs was ineffective and counterproductive and produced no actionable intelligence.

33.     Mr. Soufan subsequently wrote a book detailing his experiences at the FBI, titled *The Black Banners: The Inside Story of 9/11 and the War Against al-Qaeda*.  The book focuses primarily on Soufan's role as an FBI Special Agent in the aftermath of the 9/11 attacks.

34.     In May 2011, consistent with the employment agreement he had signed when joining the FBI, Mr. Soufan submitted a manuscript of *The Black Banners* to the FBI Prepublication Review Office.

35.     After a thorough review process, in July 2011 the FBI Prepublication Review Office cleared Mr. Soufan's manuscript for publication without requiring any significant redaction.

36.     The FBI subsequently informed Mr. Soufan that the CIA's Publications Review Board would also be reviewing the manuscript.

37.     After conducting its own review, the CIA told Mr. Soufan that large sections of the manuscript contained information the CIA considered to be classified and thus directed that this information would have to be removed before publication.

38.     Facing an imminent publishing deadline, Mr. Soufan immediately sought to have the PRB reconsider its decision.  Through a series of communications Mr. Soufan and his attorney urged that much of the information the CIA ordered to be removed from the manuscript could not possibly meet minimum classification standards, objected that Soufan's disclosures of procedures used during the FBI interrogations had been approved for publication by the FBI, and demonstrated that other purportedly classified information had been publicly and officially acknowledged by the U.S. government.

39.     The CIA refused to reconsider or rescind any of its demands for redaction of material from the manuscript, and to the contrary required additional material to be redacted after receiving Soufan's request for reconsideration.

40.     On September 12, 2011, W.W. Norton & Company published *The Black Banners* with all of the information designated as classified by the CIA blacked out.

41.     While plaintiffs do not know exactly what information lies behind the specific redactions in the published book, it is evident from the context of the censored material, as well as from plaintiffs' conversations with Mr. Soufan, that the purportedly classified information includes Mr. Soufan's descriptions of the interrogation and treatment of Abu Zubaydah by the FBI and the CIA.

**Plaintiffs' Interest in Hearing from Ali Soufan about Abu Zubaydah**

42.     Plaintiffs Raymond Bonner and Alex Gibney are journalists who are collaborating on a documentary film, already in production, that will explore the treatment of Abu Zubaydah while in U.S. custody.

43.     As a part of the documentary project, plaintiff Gibney conducted an on-camera interview with Mr. Soufan in February 2018.  In that interview, and among other topics, plaintiff Gibney asked Mr. Soufan questions about his experience interrogating Abu Zubaydah, his observations of the CIA's use of EITs on Zubaydah, and how actionable intelligence was obtained from Zubaydah.  Mr. Soufan repeatedly declined to answer any questions that would elicit information the CIA required him to remove from *The Black Banners*.  He explained that he is legally prohibited from discussing this information so long as the CIA considers the information classified.

44.     Mr. Soufan is ready and willing to discuss with plaintiffs his knowledge of the U.S. government's treatment of Abu Zubaydah during the early stages of his detention. However, Mr. Soufan credibly fears that he may be subject to criminal prosecution or face other adverse consequences from the CIA if he does so.

45.     Mr. Soufan considers himself unable to discuss with plaintiffs any of the information that the CIA required him to remove from Chapters 20, 21, and 22 of *The Black Banners* because the CIA continues to consider this information classified.  The topics covered in these chapters that plaintiffs wish Mr. Soufan to discuss for their documentary, but which the CIA has precluded him from discussing (the "Prohibited Topics"), are:

     a.  <u>The FBI interrogation of Abu Zubaydah</u>.  The traditional interrogation methods that he and his FBI partner used in interrogating Abu Zubaydah, and the results that these and any other publicly-disclosed FBI interrogation methods produced, including:

    i. The manner in which the FBI interrogators built rapport with Abu Zubaydah, including actions taken to treat his injuries and plans developed to move him to a hospital in disguise, and how Zubaydah responded to these FBI efforts;

    ii. The manner in which the FBI interrogators' background knowledge of Abu Zubaydah and Al Qaeda, and their impressions of Zubaydah's perception of the evidence against him, played a role in the FBI interrogation strategy;

    iii. The manner in which the FBI interrogators obtained from Abu Zubaydah items of actionable intelligence that have since been declassified, including the identities of Khalid Sheikh Muhammed, Jose Padilla, and others; and

    iv. Any ways in which Abu Zubaydah's affect or responses during FBI interrogations changed after he was subjected to EITs by CIA contractors.

b. <u>The CIA interrogation of Abu Zubaydah</u>.  The publicly known methods that the CIA's contractors used in interrogating Abu Zubaydah, including the use of EITs such as forced nudity, white noise, temperature control, sleep deprivation, and the "containment box," and the results that these and any other publicly-disclosed CIA interrogation methods produced, including:

    i. The manner in which the CIA contractors applied EITs to Abu Zubaydah and how Zubaydah responded to the CIA's methods; and

    ii. Any items of actionable intelligence that the CIA contractors have publicly claimed that they obtained from Abu Zubaydah.

c. <u>Identification of individuals</u>. The names and titles of individuals, identified by alias in the book, who were present during Abu Zubaydah's interrogations by the FBI and/or CIA, insofar as their names have been made public by U.S. government officials.

d. Mr. Soufan's contemporaneous response to the CIA use of EITs, including descriptions of his communications with the CIA and its contractors during the interrogation of Abu Zubaydah.

e. Actions by the CIA to suppress information relating to the use of EITs on Abu Zubaydah, including the CIA's destruction of video tapes made of Abu Zubaydah's interrogation.

46.    The CIA has no lawful basis to prevent Mr. Soufan from discussing any of the

Prohibited Topics in an interview with plaintiffs.  None concerns information that is properly

classified but, on multiple occasions, the CIA has insisted that Mr. Soufan may not discuss them.

47.     The CIA has unlawfully imposed a viewpoint-based prior restraint barring Mr.

Soufan from discussing any of the Prohibited Topics because, on information and belief, the

facts and opinions he would reveal are inconsistent with a misleading narrative propagated by the

CIA that its use of EITs produced actionable intelligence.

48.     None of the Prohibited Topics that the CIA has barred Mr. Soufan from

discussing concern properly classified information.  Some concern information about FBI

activity that the FBI does not consider classified and which the CIA has no legal basis to

classify; some involve facts and opinions that are not subject to classification under the

controlling terms of Executive Order 13526; and others involve information that has been

officially acknowledged or publicly disclosed.

49.     The Prohibited Topics that the CIA has prohibited Mr. Soufan from discussing

have been freely discussed by CIA-approved sources who advance the CIA's misleading

narrative about the supposed value of its use of EITs.

50.     For example, the former director of the CIA's National Clandestine Service, Jose

Rodriguez, published a book in 2012 called *Hard Measures* that contains an entire chapter

purporting to detail the CIA's capture and interrogation of Abu Zubaydah.  Mr. Rodriguez

provides extensive details on topics the CIA has prohibited Mr. Soufan from discussing, such as:

     a.  Mr. Soufan's interactions with Abu Zubaydah, including specific dialogue
         that passed between Soufan and Zubaydah.  *Hard Measures,* pp. 58-62.

     b.  Descriptions of antagonistic conversations that occurred between Mr. Soufan
         and CIA personnel at the black site regarding, among other things, the CIA's
         use of EITs on Abu Zubaydah.  *Id.* p. 61.

     c.  Descriptions of how Abu Zubaydah was brought to identify Jose Padilla (*id.,*
         p. 56), Khalid Sheikh Muhammed (*id.,* p. 85), and others as al-Qaeda
         operatives.

   d. Descriptions of the circumstances surrounding the CIA's destruction of videotapes of Abu Zubaydah's interrogation.  *Id.* pp. 118-119, 183-194.

All of these topics were approved by the CIA for publication by Mr. Rodriguez and are freely discussed in his book; none of these same topics were allowed in Mr. Soufan's book, which the CIA is unlawfully prohibiting him from discussing with plaintiffs.

  51. Similarly, the CIA contractor who developed and oversaw the CIA's program of EITs, James Mitchell, published a CIA-approved book in 2016 titled *Enhanced Interrogation: Inside the Minds and Motives of the Islamic Terrorists Trying to Destroy America*. Mr. Mitchell's book devotes several chapters to the interrogation of Abu Zubaydah and freely discusses Prohibited Topics censored by the CIA from Mr. Soufan's book.  Mitchell's book contains, for example:

   a. Detailed descriptions of both Mr. Mitchell's and Mr. Soufan's interactions with Abu Zubaydah, with each other, and with other CIA personnel present at the interrogations.  *See Enhanced Interrogation* at 22-38.

   b. Detailed descriptions, sometimes word-by-word, of intelligence provided by Abu Zubaydah, including intelligence regarding Jose Padilla, Binyamin Muhammed, Khalid Sheikh Muhammed, and others.  *See, e.g., id.* at 62-65, 76-77.

   c. Detailed descriptions of the EITs used by the CIA on Abu Zubaydah, how they were applied and what effect they had.  *See, e.g., id.* at 52-53, 65-72.

All of these topics were approved by the CIA for publication by Mr. Mitchell and are freely discussed in his book; none of these same topics were allowed by the CIA in Mr. Soufan's book, which the CIA is unlawfully prohibiting him from discussing with plaintiffs.

  52. On information and belief, the CIA authorized publication of the books written by Rodriguez and Mitchell containing disclosures it prohibited in the Soufan book because both Rodriguez and Mitchell portray the CIA's use of EITs as ethically and legally justifiable, highly effective, and successful in obtaining actionable intelligence from Abu Zubaydah.

53.     On information and belief, the CIA censored Mr. Soufan's book and prevented his discussion of the Prohibited Topics because he presented a different picture that undermines the CIA's narrative that its use of EITs was effective and lawful.

54.     The CIA's improper, viewpoint-based motive for suppressing Ali Soufan's account of the Abu Zubaydah interrogation is further demonstrated by the public record of misleading information disclosed by the CIA to create the impression that its use of EITs produced actionable intelligence.  For example, the Senate Select Committee on Intelligence Report on the CIA's Detention and Interrogation Program ("SSCI Report") notes that the CIA repeatedly claimed it was the use of EITs that produced information leading to the capture of Jose Padilla, and used this to argue for the efficacy of the CIA's interrogation program.. *See SSCI Report* at 223.  But Jose Padilla was arrested by U.S. officials before the CIA even began using EITs, and Soufan has said publicly that the FBI obtained this information through its use of routine interrogation techniques.

55.     Furthering the CIA narrative, three former CIA Directors—George Tenet, Porter Goss, and Michael Hayden—published an op-ed in the Wall Street Journal in 2014 claiming that the CIA's use of EITs yielded important intelligence information from Zubaydah that could not otherwise have been obtained.  Their claim has been picked up and repeated by journalists, including Marc Thiessen of the *Washington Post*, who wrote a short time later that it was only after the CIA took charge of Abu Zubaydah's interrogation that he provided the information that lead to the capture of Jose Padilla.

56.     More recently, during the Senate's confirmation hearings on her nomination tas CIA Director, Gina Haspel affirmed her belief "that valuable information was obtained from senior Al-Qaeda operatives" as a result of "the CIA's program." Ms. Haspel reaffirmed this

belief in written responses to Senators' questions, stating "the CIA was able to collect valuable intelligence that contributed to the prevention of further terrorist attacks" through its detention and interrogation program.

57.     On information and belief, Mr. Soufan's discussion of the Prohibited Topics in his book was censored by the CIA because it undermines and refutes the CIA-approved portrayal of the facts and circumstances surrounding the interrogation of Abu Zubaydah and the CIA's claims that its interrogation techniques were effective and lawful.

58.     As a result of the CIA's improper designation of the Prohibited Topics as classified, plaintiffs are denied access to the speech of Mr. Soufan, a willing speaker who could contribute important, newsworthy information to their documentary.

## CLAIM FOR RELIEF

### Violation of Plaintiffs' First Amendment Rights

59.     Plaintiffs repeat and reallege the allegations contained in ¶¶ 1 through 58 above.

60.     Plaintiffs have a right, guaranteed by the First Amendment to the Constitution of the United States, to receive information from knowledgeable and willing sources on matters of legitimate public concern, for their journalistic uses.

61.     As a result of defendant CIA's improper designation of information in Mr. Soufan's book as purportedly classified, plaintiffs are being denied their right to receive information, on matters of legitimate public concern, from an otherwise willing speaker. Specifically, as a result of defendant's actions, Mr. Soufan is unwilling to discuss with plaintiffs the Prohibited Topics, described in Paragraph 45 above, or to be interviewed on camera about these topics for plaintiffs' documentary film.

62.     In order to justify a restriction on Mr. Soufan's speech, defendant must show that the restriction protects a substantial government interest unrelated to the suppression of free

speech, and that the restriction is narrowly drawn to restrict speech no more than is necessary to protect the substantial government interest.

63.    Defendant CIA has not and cannot provide the requisite justification for its refusal to allow Mr. Soufan to speak about its Prohibited Topics.

64.    The governmental interest defendant CIA seeks to protect by precluding Mr. Soufan from speaking on the Protected Topics is not unrelated to the suppression of speech, but to the contrary is designed to prevent Mr. Soufan from contradicting the CIA's version of events and its claim that the CIA's use of EITs was effective and lawful.

65.    Precluding Mr. Soufan from speaking on the Protected Topics is not narrowly drawn to protect any substantial government interest that might exist.

66.    Mr. Soufan will not discuss the Protected Topics with plaintiffs so long as the CIA maintains that the information in his manuscript is properly classified.

67.    Accordingly, in preventing Mr. Soufan from speaking on the Protected Topics the CIA is violating plaintiffs' First Amendment right to receive information from Mr. Soufan.

68.    Unless and until this Court enters judgment declaring defendant's classification of the Protected Topics in Mr. Soufan's manuscript to be contrary to law and a violation of First Amendment rights, plaintiffs will continue to be denied their right to receive truthful information from a knowledgeable and willing source on matters of public concern.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request this honorable Court to:

A.  Enter judgment declaring that:

1.  The prohibitions on Mr. Soufan's speech imposed by the CIA in censoring from his book *The Black Banners* information relating to the interrogation of Abu Zubaydah at

the black site in 2002 are unlawful and constitute an unconstitutional prior restraint

on his right to freedom of speech;

2. Mr. Soufan has a First Amendment right to speak, free from fear of criminal

   prosecution, about:

   a. <u>The FBI interrogation of Abu Zubaydah</u>.  The traditional interrogation methods that he and his FBI partner used in interrogating Abu Zubaydah, and the results that these and any other publicly-disclosed FBI interrogation methods produced, including:

      i. The manner in which the FBI interrogators built rapport with Abu Zubaydah, including actions taken to treat his injuries and plans developed to move him to a hospital in disguise, and how Zubaydah responded to these FBI efforts;

      ii. The manner in which the FBI interrogators' background knowledge of Abu Zubaydah and Al Qaeda, and their impressions of Zubaydah's perception of the evidence against him, played a role in the FBI interrogation strategy;

      iii. The manner in which the FBI interrogators obtained from Abu Zubaydah items of actionable intelligence that have since been declassified, including the identities of Khalid Sheikh Muhammed, Jose Padilla, and others; and

      iv. Any ways in which Abu Zubaydah's affect or responses during FBI interrogations changed after he was subjected to EITs by the CIA contractors.

   b. <u>The CIA interrogation of Abu Zubaydah</u>.  The publicly known methods that the CIA's contractors used in interrogating Abu Zubaydah, including the use of EITs such as forced nudity, white noise, temperature control, sleep deprivation, and the "containment box," and the results that these and any other publicly-disclosed CIA interrogation methods produced, including:

      i. The manner in which the CIA contractors applied EITs to Abu Zubaydah and how Zubaydah responded to the CIA's methods; and

      ii. Any items of actionable intelligence that the CIA contractors have publicly claimed that they obtained from Abu Zubaydah.

   c. <u>Identification of individuals</u>. The names and titles of individuals, identified by alias in the book, who were present during Abu Zubaydah's interrogations by the FBI and/or CIA, insofar as their names have been made public by U.S. government officials.

      d.  Mr. Soufan's contemporaneous response to the CIA use of EITs, including descriptions of his communications with the CIA and its contractors during the interrogation of Abu Zubaydah.

      e.  Actions by the CIA to suppress information relating to the use of EITs on Abu Zubaydah, including the CIA's destruction of video tapes made of Abu Zubaydah's interrogation.

3.  Plaintiffs' First Amendment rights have been violated by the CIA's prohibitions on Mr. Soufan's speech about the interrogation of Abu Zubaydah at the black site and the use and effectiveness of the EITs used on him.

B.  Award plaintiffs the costs of this action and reasonable attorneys' fees under the Equal Access to Justice Act or any other applicable law; and

C.  Grant such other relief as the Court may deem just and proper.

Dated: December 3, 2018
      New York, New York

Respectfully submitted,

    */s/ David A. Schulz*
David A. Schulz (DS-3180)
MEDIA FREEDOM & INFORMATION ACCESS CLINIC
ABRAMS INSTITUTE FOR FREEDOM OF EXPRESSION
Yale Law School
1675 Broadway, 19th Floor
New York, NY 10019-5820
Tel: (212) 850-6103
Fax: (212) 223-1942
david.schulz@yale.edu

Charles Crain (*pro hac vice* forthcoming)
David Froomkin, law student
Katrin Marquez, law student
MEDIA FREEDOM  & INFORMATION ACCESS CLINIC
ABRAMS INSTITUTE FOR FREEDOM OF EXPRESSION
Yale Law School P.O. Box 20825
New Haven, CT 06520
Tel: (203) 436-5824
Fax: (203) 432-3034
charles.crain@ylsclinics.org

*Counsel for Plaintiffs*

TO:    Central Intelligence Agency
c/o Litigation Division, Office of
General Counsel
Central Intelligence Agency
Washington, DC 20505.

Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

United States Attorney
Southern District of New York
1 Saint Andrews Plaza
New York, NY 10007